Kirkpatrick, Ch. J.
— By the principles of the common law, a bond, being a chose in action, could not be assigned or granted over. It was thought to be an encouragement to litigiousness, and to cover maintenance, to suffer a man to make over to another, a mere right of going to law. This nicety, however, came, in process of. time, to be, in some measure, disregarded; and though the assignment was, in foi’m, but an appointment of an attorney to sue for and recover the money [*] due, in the name of the obligor; yet, where it was made for valuable consideration, even courts of law would take notice of the real interest of the parties, and protect the assignee.
The Legislature, however, have thought fit to change the law in this respect, and have declared that assignments of bonds shall be .good and effectual in the law, and that the assignee may maintain an action of debt thereupon in his own name. Instead of being the .agent or attorney, therefore, of the obligor, to receive the money, with an equitable lien thereupon, to reimburse himself for what he may have advanced on the assignment, the assignee, by this act, becomes the absolute owner of the property. Bonds, by this means, like personal chattels in possession, are thrown mto open market.
The question is, shall the assignor be liable on the assignment, in case the obligor fails ?
It is admitted on all hands, that there is nothing in the act making bonds assignable, that can, at all, affect this question. It must be determined upon general principles.
The case of Deeding against Farrington, in 1 Mod. 118, has been cited by the plaintiff’s counsel, to show that the word assign, in itself, implies a covenant, and is sufficient to support this action. But this case, I think, has been mis *21 apprehended. It is more fully stated in 12 Mod. 554-There, one had assigned all the money that should be allowed him by the town of Hamburgh, in lieu of his share of a certain ship [16] —but, afterwards, himself received the money; and for this money, this action was brought; and it was adjudged for the plaintiff. This was a receiving of the money, by the assignor himself, contrary to his contract. It has no resemblance to the present case.
Again: It is said, that an action would lie by the assignee, against the assignor of a promissory note, (which is a chose in action) before the 3 and 4 of Ann, which puts promissory notes on the same footing with inland bills [*] of exchange: and for this the case of Lambert and Oakes is cited from 1 Ld. Raym. 443. And it is urged that upon the same principle, an action will lie by the assignee, against the assignor of a bond.
It is manifest from 2 Ld. Raym. 757, as well as from 3 Bac. 605, that sundry attempts were made before the statute of Ann to bring promissory notes themselves within the custom of merchants, by considering them, and likening them to bills of exchange; and indeed it would seem that this notion had prevailed to a considerable extent. The probability is, that to aid these attempts, and in conformity with this notion, indorsements were made in the common form of bills of exchange; and that they were really considered as new bills drawn on the ground of the money due on the notes. L. Mansfield says in 2 Bur. 676, that the indorsement of a note, is an order by the indorser upon the maker of the note, (his debtor by the note) to pay the indorsee. And that this is the very definition of* a bill of exchange.
Though the courts, therefore, successfully resisted the attempt to bring the notes themselves within the custom of merchants, yet the indorsements, being, probably in form, and certainly in their substance, bills of exchange, were *22 declared upon and recognized as such. The indorser became liable upon the custom of merchants, and not upon any-implied covenant or promise contained in the indorsement, distinct from that raised by such custom.
In the case of Lambert and Oakes it was liolden, in substance, that the indorsee had but to demand the money of the maker of the note, and if it were refused, he had his action against the indorser; and that for the whole amount, even though it had been indorsed upon a discount.
Now can it be pretended that this would be the effect of an assignment of a bond ? Is there any case to give color to such a construction ? I can find none.
Bonds are instruments of a different nature. They [*] are made for different purposes; for more permanent securities; for payment of money usually at more distant days. They never have been cast into the mercantile world, and passed, as cash, from hand to hand [17] like notes and bills, neither in this, nor, so far as my information goes, in any other country. With the principles of the law merchant, as negotiable paper, they are altogether unconnected.
A case has been cited, as determined in this court some years ago, in which this question arose, and in which the action was sustained. I mean the case of Meliehn and Barnet. I remember that case. I was the attorney on record for the plaintiff, and the decision was so.
It is to be remembered, that before the act making bonds assignable, the assignee as I have before stated, was, in contemplation of law, but the attorney or agent of the obligee to recover the money, with a lien upon it when recovered, to reimbujpe himself for what he had advanced. If, therefore, he made use of all that diligence for the recovery, which a faithful agent or attorney ought to use, and the money were notwithstanding lost, it was lost to the assignor, and that upon the strictest legal principles. The only question in those cases between the assignor and assignee was of due *23 diligence. And the case turned upon this question in Mehelm and Barnet. (Coxe, 86.)[1]
But now, that bonds are made and assignable in law; that the property absolutely passes by the assignment; and that they are put upon the same footing with personal property in possession, the buying and selling of them must be governed by the same law.
This law is laid down in 2 Black. Com. 455: “A purchaser of goods and chattels may have a satisfaction from the seller, if he sells them as his own and the title proves deficient, without any express warranty for that purpose. But with regard to the goodness of the wares so purchased, the vendor is not bound to answer; unless he expressly warrants them to be sound and good; or unless he knew them to be otherwise, and hath used any [*] art to disguise them;' or unless they turn out to be different from what he represented them to the buyer.”
This I take to be the correct principle of the common law. And however it may have been made to bend to the equitisinr/ imaginations of some lawyers of the late day in England, yet still it is the law of Yew Jersey. In the case before us, there was no pretense of warranty given in evidence ; or of concealment or disguise; or of misrepresentation. It was pretended, it is true, to set up some parol averment at the time of the assignment, but it was overruled by the judge who tried the cause; and I think upon the soundest principles. As to [18] the doctrine of the consideration having failed, it has no application here, nor indeed is it insisted upon by the plaintiff.
Upon fhe whole, I am of opinion that bonds and bills for payment of money, under the act of the Legislature, may be bought and sold, subject to the provisions therein mentioned, in the same manner as other personal things in possession; that the seller is subject to no hidden covenant, promise *24 or fetch, but that the transaction must rest upon the same general principles which govern all other sales of personal chattels.
In my opinion therefore there must be judgment of nonsuit.
Rossell, J.
— This cause rests on the single point, whether an assignor of a bond is liable to the assignee, should the obligor be unable to pay the sum conditioned for in the bond. I have ever understood that he was, provided due diligence was used by the assignee; and until I heard this question so ably argued at this bar, had not a doubt on the subject. I confess, from the many authorities cited by the gentlemen in favor of a contrary opinion, and the ingenuity of their arguments, I was very strongly inclined to believe myself in an error. On a more close examination of the question, I however, adhere to my first impressions. In 1 Ld. Raym. 683, Chief Justice Holt lays it down as law, that “ though a bond is not assignable in point of interest, it [*] is a covenant that the assignee shall receive the money to his own use.” Hale, Chief Justice, lays down the same principle precisely, in 1 Bacon, 538. And I cannot but think, the words, “ shall receive,” have a more extensive meaning than the one assigned them by the óounsel for the defendant. And in this opinion, I am strongly supported by that of our late Chief Justice Kinsey, who, in the case of the administrators of Lloyd v. Bloomfield, tried at Burlington, recognizes this doctrine in its fullest extent, and expressly states that, “ am assignment implies a covenant that the obligor is able to pa/y.” This, as far as my knowledge extends, is also the general understanding of the country; and from which only, the understanding of the parties, at the time of making the contract, can be collected, when it is not expressed. But the sale of the bonds is likened unto that of horses, in which the seller, without an express warrantee, is said not to be liable; although I do not for several obvious reasons, think this similitude correct, yet if it is, the more *25 modern doctrine, that & fair price implies a warrantee, is, in my opinion, the most just and reasonable. If law, as it is said to be, is founded on justice, and is the perfection of reason, it should compel a compliance [19] with the fair and honest intentions of the parlies, at the time of making the contract. Suppose A., the owner of an horse, in the possession of B., and being desirous of turning him into money, offers him at a fair price, to C., who knowing the horse, and wanting one, pays A. for him. No warrantee is asked or given; both parties are satisfied; one in believing he has parted with his horse for his value; the other that he has a fair equivalent for his money. It afterwards appears that before the sale, the horse without the knowledge of the parties, had, by some accident, become totally useless: is then the spirit of the contract complied with, and the honest expectations of the parties fulfilled ? Most certainly not. It will not be disputed, if A. had been acquainted with the useless situation of his horse, and thus imposed him on C., at a fair price,, but that he would have been equitably liable to the purchaser, for the [*] money paid. It is a well known principle of law, “that the obligations of natural justice are as strong as the most express promise,” and A., not having given to C., what he himself, at the time of making the contract, believed to be a just and fair equivalent for his money, is bound in conscience to make him whole. This reasoning will equally apply to bonds. A. advances money on the bond of B., to C. the obligee. If A. could have supposed B. unable to pay, he most certainly would have kept his money. If C. knew at the time of sale, the obligor to be insolvent, he acts dishonestly. If he assigns the bond, under the idea that he gives value for the money received, and it appears he was mistaken, he is bound to do justice to A., whose money he has taken without any equivalent, contrary to his expectations or even wishes, if lie is an- honest man. I, however, do not conceive that it is of so much *26 consequence how this question is decided, as that it should be permanently settled, and rightly understood. But for the reasons before given, as well as for the sake of uniformity in our decisions, I am of opinion, that the defendant below, take nothing by his motion; and that judgment be entered for the plaintiff.
Pennington, J.
— The simple question in this case is, can an action be sustained, against the assignor of a bond, by the assignee, on failure of the obligor to pay, and this in virtue of the assignment only — the case steering clear of fraud, deceit, or express warrantee, or any special undertaking, on the part of the assignor, to indemnify or any way save harmless the assignee, in case the obligor should fail to pay; no express promise being proved, or even alleged. This action is bottomed on an implied promise, on the part of the assignor, arising [20] out of the nature of the transaction, to refund to the assignee, the consideration he received of him for the assignment, in case the obligor should be unable to pay. In the sale and assignment of bonds, I have always considered the transaction to import nothing more, than that the assignor transferred to the assignee, his interest in the bond, with an authority, before the statute making [*] bonds assignable, for the assignee to sue in the name of the assignor — and since the statute, in his own name. An assignment is defined to be, the appointment and setting over a right to another. Wood’s Inst. 281. The language of the assignment, in the case under consideration, is in accordance with this definition, to wit: “I do assign all my right, title, interest and claim whatsoever I have unto the within bond, unto Henry Garretsie.” Whatever right the defendant had, he transferred to the plaintiff. In the assignment of instruments relative to land, it is said in Wood’s Inst. 282, to be necessary to insert a covenant, on the part of the assignor, that he is owner in possession, and hath power to assign, shutting out the idea of an implied *27 covenant, or agreement altogether. Whether the simple assignment of a bond, raises a covenant or agreement by implication, that the assignor is the true owner of the bond, and hath power to assign, and that the money is bona fide duo, is a question that it is time enough to determine when it is raised. But that there is an implied contract growing out of the transaction, that the assignor will pay if the obligor is unable, is wholly unsupported by any authority, ancient or modern, except the case of Mackie’s executors against Davis, determined in the Virginia Court of Appeals, in 1796, cited by the counsel for the plaintiff, iromWaehington’e Reporte. This occasion appears to have taken place, partly from the peculiar customs of Virginia — and partly as I apprehend, from the improper confounding the common with the mercantile law. It is true, that the law merchant, is part of the common law; it hath been for public convenience, and the benefit of commerce, adopted by and incorporated into it. But it is still confined within its original limits, and doth not extend to subjects of which before, it had no cognizance. We might as well look into the mercantile law, for the origin of feoffments, knight service, gavel-kind, or socage tenures, as for doctrines respecting the assignment of bonds. They are all equally strangers to the custom of merchants. The right of the indorsee of a foreign bill of exchange, to recur [*] back to the indorser or drawer, in ease of the failure or refusal of the drawee, is purely of mercantile origin, and confined by the law merchant to that species of negotiable paper. A little more than a century ago, owing to the increase of domestic commerce, inland bills of exchange, began [21] to be treated as foreign bills; and in the reign of William III. were, by act of Parliament, pitt on the same footing as foreign bills of exchange. The commercial spirit of the nation, carried this still farther — so much so, that promissory notes were, in the reign of Queen Ann, put on the footing of inland bills of *28 exchange; in both these cases, however, acts of Parliament were thought necessary, to legalize the practice. The exact resemblance that inland bills of exchange have to foreign, very naturally led to the first; a supposed resemblance (for which we are indebted to mercantile ingenuity) between indorsed notes and bills of exchange, produced the second. The assignment, or what is now called the .indorsement of a note, was considered as an order drawn by the payee of the note, on the maker of the note, in favor of a third person, commanding him to pay the contents thereof; and as such resembled a bill of exchange. The maker of the note was considered as the drawee or acceptor of the bill; the indorser as the drawer, and the indorsee as the payee; and as notes are found to be of great use in commercial operations, a convenience hath grown out of the invention. But to extend this doctrine to bonds, and other sealed instruments, without the authority of any statute, would, as I apprehend, be outraging, as well the common, as the mercantile law.
It is said, however, by the learned counsel for the plaintiff, that bonds in this country are in the same situation that promissory notes were in England before the statute of Ann. In this, I think, they are mistaken. From the supposed resemblance between indorsed notes, and bills of exchange above mentioned, a practice had obtained in England, before the statute of Ann, of treating indorsed notes, in all respects as bills of exchange. It appears, by the case in Carthew, 269, and [*] the observations of Lord Chief Justice Holt, which I shall presently take notice of, that they were declared on, under the custom of the merchants. In tire first year’ of Queen Ann, this practice came up judicially before the Court of King’s Bench, in the case of Clerke v. Martin, as reported in 2 Ld. Raym. 757, when Lord Holt said, “that the maintaining these actions upon such notes, were innovations upon the rules of the common law, and invented in Lambert street, which attempted in these matters of bills of *29 exchange to give laws to 'Wesminster Hall. That the continuing to declare upon these notes, upon the custom of merchants, proceeded from obstinacy and opionionativeness, since he had always expressed his opinion against them.” The next year the same question came up again in the case of Buller [22] v. Crips, reported in 6 Mod. 29. Lord Holt still expressed his opinion against the practice. This opinion of Lord Holt, concurred in by the Court of King’s Bench, no doubt gave rise to the statute 3 and 4 Ann, passed the next year, putting promissory notes on the same footing as inland bills of exchange. It surely will not be pretended, that the same practice, hath obtained in this country, or at least in this State, of treating bonds, as had obtained in England, before the statute of Ann, in respect to promissory notes. The declaration in this case, does not treat the bond as a bill of exchange; the action is not founded on the custom of merchants; and if it had been, it would have been demurrable to for that cause.
An assigned bond, must be considered as a bill of exchange, or a mercantile negotiable paper, in the nature of a bill of exchange, or it must not. If the first, then it must be treated as such throughout; it must be declared on, under the custom of merchants, a demand on the obligor, (who in this respect must be considered as the acceptor of the bill,) must be substantially alleged in the declaration, and his refusal or neglect to pay; also, notice to the assignor, who is to be considered as the drawer of the bill, must be laid, and the whole proved on trial. If the latter, then the instrument must [*] be considered as at common law, and the law merchant shut out of the case. We cannot adopt an amphibious practice, running into this or that .law, as we may find it accord with our present notions of equity and justice. I am aware that Roane, Justice, in the case cited from Virginia, is represented as holding an opinion, that the right of the indorsee of a bill of exchange, to resort to the drawer or *30 indorser, in case of the failure of the drawer to pay, is founded on the common and not on the mercantile law. There are some dicta in the books, that at first view, countenance the idea; but on investigation, it will be found, that these writers have confounded common with the mercantile law; probably considering that the former had merged the latter; and make use of the general words common law, in contradistinction to statute law; for it is in that relation, they use the words. The opinion of the learned judge, is a perfect novelty to me; for I have always understood that a bill of exchange was of mercantile origin; that its qualities, effect, and operation, were fixed and governed by the custom of merchants, which had universally obtained among commercial nations, before it was adopted by the common law of England: that the right in question had its origin solely in the custom of merchants; and I find this opinion supported in 4 Bacon, [23] 685; Cro. Car. 301; Carthew, 510, and the precedents of declarations in cases of foreign bills of exchange. I am of opinion that the right of the indorsee, to recur to the drawer or indorser, in case of the failure of the drawee to pay, is derived solely from the law merchant; that although the common law had adopted the law merchant, yet it hath not extended or applied its principles to bonds or other writings obligatory; nor hath our act of Assembly, legalizing the assignment of bonds, changed the law in this respect; therefore, that the plaintiff cannot prevail, on the count for money had and received — which is the next thing to be considered.
The material ground of this count is, that the defendant hath received a sum of money of the plaintiff, [*] which in a legal point of view, he cannot in equity and good conscience retain. In the first place, no evidence was given at the trial, that any money was paid; the consideration for the assignment of the bond, might have been land or goods, or even love and affection. But supposing money had been *31 paid, on what ground should it be returned? Fraud or extortion is not pretended, the money could not have been paid by mistake, nor under a void authority. But the counsel for the plaintiff contend, that it was paid on a consideration which happened to fail, which leads to an inquiry after the consideration. This was, that the defendant should transfer all his right, title, and interest in the bond, and the money due thereon, to the plaintiff. This was done, and this chose in action, completely vested in the plaintiff. The consideration was, that the plaintiff' should stand in the shoes of the defendant, as to his right in a chose in action. This was a lawful bona fide transaction, vesting in the plaintiff, the assignee, the whole of the defendant’s right to the thing assigned. It was proved at the trial, that the obligor was at the time of the assignment, in good standing, and that there were no suspicions that his circumstances were bad. It appears to me, that this was a real substantia] consideration ; and that the defendant may conscientiously retain the money, provided there has been any paid. If the bond had been void by circumstances unknown to the plaintiff, at the time of the assignment, the consideration for the money advanced, would have failed; he would not have got from the nature of the transaction, what it was intended he should have; that is, a valid bond against ,the obligor, in his own right.
The loss here, was a subsequent loss; and may be compared to the accidental burning of a house, or death of an ox, after purchase and delivery. Supposing one man was to pay another, one hundred dollars for the use of a piece of land a year, and a hurricane should destroy his whole crop, could he recover the money back [24] again, under the idea that it was paid for a consideration which happened to fail ? Most certainly not. He had what he paid his money for, [*] a chance of raising a crop. On the whole, I am clearly of opinion, that on neither count, can this action be *32 sustained; and that the verdict must be set aside, and judgment of nonsuit entered.
By the Court. — Let the verdict be set aside, and judgment of nonsuit be entered.
Vide Harris’ Adm’rs v. Clarks, post, 158; Davenport v. Barnes, post, 211; Boylan v. Dickerson, post, 430; Stout v. Stevenson, 1 South. 178.
Cited in Mehelm v. Barnet, Coxe 86; Davenport v. Barnes, 1 Penn. 211; Boylan v. Dickerson, 2 Penn. 430; Woolley v Sergeant, 3 Halst. 262; Barrow v. Bispham, 6 Halst. 110; See Glover v. Armstrong, 3 Gr. 186.

 See Stout v. Sevenson, 1 South. 181. — Ed.